**AMERICAN TRADE PARTNERS, L.P.**

v.

**A–1 INTERNATIONAL IMPORTING ENTERPRISES, LTD.; John G. Cassidy, Sr.; Kevin P. Cassidy; Vincent G. Restivo; Francis Santangelo; and Premier International Importing Co., Inc.**

Civ. A. No. 90–3992.

United States District Court,
E.D. Pennsylvania.

Feb. 11, 1991.

560

See also 757 F.Supp. 545.

Richard L. Scheff, Philadelphia, Pa., for plaintiff.

Sheldon Eisenberger, Joseph Zelmanovitz, New York City, for defendants Premier Intern., and Vincent G. Restivo.

Susan G. Kellman, New York City, for defendant Francis Santangelo.

William I. Aronwald, White Plains, for defendants Jack Cassidy & Kevin Cassidy.

Joseph A. Lichtenthal, White Plains, for defendant A-1 Intern. Importing as receiver.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

DITTER, District Judge.

Plaintiff, American Trade Partners, L.P. ("ATP"), moves for a preliminary injunction against defendants, A-1 International Importing Enterprises, Ltd., John G. Cassidy, Sr., Kevin P. Cassidy, Vincent G. Restivo, Francis R. Santangelo, and Premier International Importing Co., Inc. ATP seeks an order requiring defendants to notify purchasers of A-1's or Premier's goods to pay ATP directly, to account for ATP's alleged loss in excess of $2,000,000, to disclose A-1's and Premier's books and

**562**

records to ATP for inspection and photocopying, and to identify and to describe personal financial information. Most important, ATP requests that I freeze defendants' assets to secure the availability of funds in the event a money judgment is entered against them in the future.

The amended complaint alleges ten causes of action: a request for a preliminary injunction (count I); violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(a), (b), (c), and (d) (counts IV, V, III, and II, respectively); breach of contract (count VI); conversion and fraud (count VII); breach of trust (count VIII); violations of New York's fraudulent conveyance statutes, Debtor & Creditor Law §§ 273, 274, 275 and 276 (count IX); and tortious interference with contracts (count X).

Hearings on ATP's motion for preliminary injunction were held on July 30, September 12, November 5, 6, and 7, 1990. The parties have fully briefed the motion for preliminary injunction. Additionally, I permitted the parties to submit proposed findings of fact and conclusions of law and post-hearing briefs.[1]

As required by Fed.R.Civ.P. 52(a) and based upon the oral and documentary evidence, I make the following:

### FINDINGS OF FACT [2]

1. The court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1332 and 18 U.S.C. § 1961. Venue is properly laid in this court under 28 U.S.C. § 1391 and 18 U.S.C. § 1965.

2. ATP is a Delaware limited partnership with its principal place of business in Philadelphia, Pennsylvania.

3. Defendant A–1 International Importing Enterprises, Ltd. ("A–1") is a New York corporation with its principal place of business located in that state.

4. Defendant Premier International Importing Co., ("Premier") is a New York corporation with its principal place of business located there.

5. Defendant John G. Cassidy, Sr. ("Jack Cassidy") is a citizen of New York and was the president, a director, and a shareholder of A–1.

6. Defendant Kevin P. Cassidy is a citizen of New York and was the vice-president and treasurer, a director, and a shareholder of A–1.

7. Defendant Vincent G. Restivo is a citizen of New York and was the vice-president and secretary, a director, and a shareholder of A–1.

8. Restivo also participated in the formation of Premier and is its president and employee.

9. Defendant Francis R. Santangelo is a citizen of New York and was an organizer, a director, a promoter, an officer, and a shareholder of A–1.

10. Santangelo was an organizer and is the chief executive officer, a director, and a shareholder of Premier.

11. At all times relevant to this case, ATP was in the business of "factoring," that is purchasing, at a discount, accounts receivables from clients in need of financing.

12. At all times relevant to this case, A–1 imported merchandise from foreign countries for resale in the United States to "account debtors," such as the Home Shopping Network ("HSN"). A–1 used "factors" to fund its operations.

13. From its formation in January, 1990, Premier functioned similarly to A–1. Both companies imported similar goods from the same companies in Europe. They sold those goods to HSN.

---

**1.** It must be noted that A–1 has not responded to the complaint and has not challenged the imposition of injunctive relief against it. A receiver has been appointed for A–1 by a New York state court. The receiver was notified of the hearings on ATP's motions.

**2.** Other factual findings could have been made at this time given the extensive testimony, briefing, and arguments of counsel. I will reserve judgment as to those facts until a later date. The findings of fact and conclusions of law herein are limited to those relevant to ATP's motion for a preliminary injunction.

14. Jack Cassidy directed the operation of A–1 as its president. He participated in the formation of A–1, directed its financial affairs, supervised profit distributions, signed A–1's checks, and submitted his own personal expenses for payment by A–1. He directed and controlled, in part, the disbursement of A–1's money to ATP, to A–1's shareholders, and to third parties on behalf of the shareholders to cover their personal expenses. He was also the liaison between A–1 and ATP. From March 1, 1988, until mid-January, 1990, he arranged the transactions between the two companies and handled the paperwork necessary to complete each deal.

15. Kevin Cassidy was responsible for sales to HSN. He performed services for A–1 at HSN's offices in Florida and at A–1's offices in New York. He participated in A–1's formation, filled out orders for invoices, co-signed A–1's checks with his father, Jack Cassidy, and submitted his personal expenses for payment by A–1. He also directed and controlled, in part, the disbursement of A–1's money to ATP, to A–1's shareholders, and to third parties on behalf of the shareholders to cover their personal expenses.

16. Restivo performed his services for A–1 at A–1's offices in New York and in Europe when visiting suppliers. He participated in A–1's formation, ordered goods from suppliers in Europe at the direction of Kevin Cassidy and Santangelo after purchase orders from HSN were received, participated in organizing shipments of goods to HSN, submitted his personal expenses for payment by A–1, and co-signed A–1's checks with Jack Cassidy and Kevin Cassidy. He also directed and controlled, in part, the disbursement of A–1's money to ATP, to A–1's shareholders, to Premier, and to third parties on behalf of shareholders to cover their personal expenses.

17. Santangelo performed his services for A–1 primarily in Florida at HSN's offices, although he also performed services for A–1 and attended A–1 meetings in New York. He participated in A–1's formation, served as a liaison between A–1 and HSN, submitted personal expenses to A–1 for payment, and visited European suppliers on occasion. Santangelo did not sign A–1's checks. His primary function was to assure prompt payment of A–1 invoices by HSN and to assist in developing sales by A–1 to HSN. He also directed and controlled, in part, the disbursement of A–1's money to ATP, to A–1's shareholders, to Premier, and to third parties on behalf of shareholders to cover their personal expenses.

18. On March 1, 1988, American Trade Credit Corporation ("ATCC") and A–1 entered into an accounts purchase agreement. That agreement provided that ATCC would fund the operations of A–1 by purchasing invoices from A–1 at a discount. Jack Cassidy, as president of A–1, and Restivo, as secretary of A–1, signed the agreement.

19. In May, 1988, ATCC assigned its receivables and all rights and obligations in and under its contracts with A–1 to ATP.

20. As a result of this assignment, the obligations, duties, and liabilities of A–1, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo, whether created by the accounts purchase agreement, the security agreement, *see* ¶ 27, or the personal guarantees, *see* ¶¶ 23–26, that had been owing to ATCC, now exist for the benefit and protection of ATP as though ATP had been the entity which entered into those agreements.[3]

21. Under the accounts purchase agreement, a copy of which is attached as exhibit 1 and made a part hereof, A–1, and its authorized agents, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo, warranted, *inter alia*, that:

a. all invoices purchased by ATP would be paid on or before their respective due dates by the account debtor, and if not, by A–1;

---

**3.** I recognize that it would be more accurate if I were to refer to ATCC when speaking of how the duties and obligations owed by the defendants were created; however, given the assignment of the contracts to ATP and the need for brevity and clarity in this document, I will refer to ATP only.

b. any property returned by an account debtor to A–1 would be held in trust for ATP as security;

c. all invoices purchased by ATP would represent bona fide indebtedness to A–1 arising from the actual sale and delivery of goods to the account debtor;

d. all invoices purchased by ATP would represent the actual sale and delivery of goods that were "finally accepted" by the account debtor;

e. all invoices purchased by ATP would reflect amounts "unconditionally owing" to A–1;

f. notification would be sent to account debtors to pay ATP or to deposit the proper amount in ATP's designated lockbox;

g. all payments received by A–1 from account debtors on the purchased invoices would be held in kind and in trust for the benefit of ATP;

h. all payments received by A–1 from account debtors on the purchased invoices would be delivered without negotiation to ATP;

i. A–1's corporate books and records would be available to ATP for inspection and review; and

j. that all reasonable attorney's fees and court costs which ATP incurred to enforce the provisions of the account purchase agreement would be paid in full upon ATP's demand.

22. The accounts purchase agreement also provided that:

a. ATP's remedies in the event of a breach would not be exclusive;

b. ATP's decision to exercise one remedy would not waive the right to exercise a different remedy on the same or another occasion;

c. all transactions under the agreement would be deemed to be consummated in Pennsylvania;

d. Pennsylvania law would apply if disputes arose between A–1 and ATP; and

e. A–1 waived its rights to a trial by jury in the event litigation arose between A–1 and ATP.

23. On or about March 1, 1988, Jack Cassidy, Kevin Cassidy, and Restivo each signed a personal guarantee, a copy of which is attached as exhibit 2 and made a part hereof, that A–1 would discharge its obligations to ATP and that to the extent A–1 failed to do so, each of them would discharge its obligations.

24. Pursuant to the guarantees, Jack Cassidy, Kevin Cassidy, and Restivo were each personally liable for any default under or breach of the accounts purchase agreement by A–1.

25. In addition, Jack Cassidy, Kevin Cassidy, and Restivo each guaranteed that he would not impede or interfere with the collection by ATP of unpaid purchased invoices and would report to ATP all disputes with account debtors.

26. By their guarantees, Jack Cassidy, Kevin Cassidy, and Restivo each guaranteed to ATP that no officer, employee, or agent of A–1 had committed or would commit any fraud, deceit or criminal act in connection with the transactions under the accounts purchase agreement.

27. A–1 and ATP also signed a security agreement, a copy of which is attached as exhibit 3 and made a part hereof, which granted to ATP a security interest in all of A–1's accounts, general intangibles, chattel paper or other instruments, and contract rights.

28. On March 1, 1988, Jack Cassidy, Kevin Cassidy, and Restivo, as A–1's directors, officers, and agents, signed a "Certificate of Resolutions and Incumbency," a copy of which is attached as exhibit 4 and made a part hereof. That document memorialized a resolution of A–1's board of directors that "any one or more of the officers or agents" of A–1 were authorized to:

a. enter into and execute the accounts purchase agreement;

b. grant to ATP a security interest in A–1's property as described in the security agreement;

c. sell invoices to ATP;

d. make remittances and payments to ATP by check or draft; and

e. "do and perform all other acts and things deemed by such officer or agent necessary or desirable to effectuate the intent of any of the" relevant contracts.

29. During the twenty-one month period between March 1, 1988, and January 1, 1990, pursuant to the accounts purchase agreement, ATCC and ATP purchased eighty-two invoices totalling $16,157,451.30 from A-1.

30. Between March, 1988, and February 1, 1989, HSN and A-1 made timely payments to ATCC and ATP on purchased invoices.

31. On or about February 1, 1989, a signed copy of a "Summary of Financing Program" ("summary") was sent from A-1 to ATP. The summary described the year's new pricing details, procedures for the financing program, and an explanation of the insurance policy for the purchased accounts receivables.

32. This summary was not a new agreement. It did not materially modify or rescind the accounts purchase agreement. It was not a novation or a substitution. It merely altered some of the pricing and financing details.

33. The accounts purchase agreement, the guarantees, and the security agreement remained in full force and effect.

34. By letter dated and mailed March 4, 1988, A-1, as required under the accounts purchase agreement, directed HSN to make payment on A-1 invoices to ATP's lockbox in New York.

35. ATP also requested that A-1 stamp its invoices sent to HSN with instructions to make payment to ATP or to ATP's lockbox.

36. A significant number of invoices sent out were not stamped with this instruction.

37. Moreover, in a letter dated and delivered by Federal Express on January 25, 1989, Jack Cassidy notified HSN to "continue" to make payments on all invoices directly to A-1. The letter further stated that "[u]nder no circumstances should remittances be made to any third party or to any other designation, without our written authority."

38. On numerous occasions prior to the posting of the January 25, 1989, letter, and regularly thereafter, HSN made payments directly to A-1 on invoices sold to ATP.

39. ATP was aware of this practice and protested to A-1. ATP again requested that the payment instructions be stamped on all invoices and an additional letter with this request be sent to HSN.

40. Jack Cassidy, as the authorized agent of A-1, Kevin Cassidy, Restivo, and Santangelo, represented to ATP's vice president, Robert Taylor, by telephone, that the required instructions had been and would continue to be stamped on invoices and that HSN had been and would be notified again to send payments to ATP's lockbox. This representation was false and Jack Cassidy knew it was false.

41. ATP, however, continued to purchase invoices from A-1, because A-1 turned over to ATP the payments from HSN, at least until the summer of 1989.

42. Throughout the latter half of 1989, and January, 1990, a number of purchased invoices went unpaid by A-1 after it had received payment from HSN. Those still outstanding are:

a. Invoice no. 1349 for $232,500.00, dated June 6, 1989, and funded by ATP through a wire transfer on June 12, 1989, to A-1's Chase Manhattan Bank account. As of October 24, 1990, the following was due ATP: $232,500.00 plus interest of $54,462.33, for a total debt of $286,962.33.

b. Invoice no. 1351 for $329,750.00, dated June 13, 1989, and funded by ATP through a wire transfer on June 19, 1989, to A-1's Chase Manhattan Bank account. As of October 24, 1989, the following was due ATP: $329,750.00 plus interest of $76,104.49, for a total debt of $405,854.49.

c. Invoice no. 1353 for $912,550.00, dated July 12, 1989, and funded by ATP through a wire transfer on July 17, 1989, to A-1's Chase Manhattan Bank account. As of October 24, 1990, the following was due American Trade: $211,112.41 (the rest of the debt is reflected in unpaid invoices nos.

1415, 1417, and 1419) plus interest of $45,-704.39, for a total debt of $256,816.80.

d. Invoice no. 1358 for $19,973.25, dated August 1, 1989, and funded by ATP through a wire transfer on August 22, 1989, to A–1's Chase Manhattan Bank account. As of October 24, 1990, the following was due American Trade: $19,973.25 plus interest of $4,127.08, for a total debt of $24,100.33.

e. Invoice no. 1359 for $104,000.00, dated August 2, 1989, and funded by ATP through a wire transfer on August 22, 1989, to A–1's Chase Manhattan Bank account. As of October 24, 1990, the following was due American Trade: $104,000.00 plus interest of $21,438.25, for a total debt of $125,438.25.

f. Invoice no. 1399 for $33,387.00, dated August 4, 1989, and funded by ATP through a wire transfer on August 22, 1989, to A–1's Chase Manhattan Bank account. As of October 24, 1990, the following was due American Trade: $33,387.00 plus interest of $6,832.90, for a total debt of $40,219.90.

g. Invoice no. 1415 for $205,575.00, dated December 15, 1989. This invoice was not funded, rather it was a replacement for part of the debt owed on invoice no. 1353. As of October 24, 1990, the following was due American Trade: $205,575.00 plus interest of $28,690.38, for a total debt of $234,265.38.

h. Invoice no. 1417 for $347,695.00, dated December 28, 1989, and funded by ATP through a wire transfer on August 22, 1989, to A–1's Chase Manhattan Bank account. As of October 24, 1990, the following was due American Trade: $347,695.00 plus interest of $46,295.83, for a total debt of $393,990.83.

i. Invoice no. 1419 for $265,760.00, dated December 28, 1989, and funded by ATP through a wire transfer on August 22, 1989, to A–1's Chase Manhattan Bank account. As of October 24, 1990, the following was due American Trade: $265,760.00 plus $35,386.13, for a total debt of $301,-146.13.

43. Certain of those invoices did not represent bona fide sales and deliveries of merchandise to HSN, did not represent the actual sale and delivery of merchandise that had been finally accepted by HSN, or did not accurately reflect amounts unconditionally owing from HSN to A–1 and ATP. Specifically, those invoices are:

a. A–1 invoice no. 1349 which when sold to ATP reflected an HSN order of 15,000 Vatican coin sets at a total cost of $232,-500. ATP funded this amount. HSN documents, however, reveal that only 1,500 sets were ordered by and shipped to it at a total cost of $23,250. HSN paid $23,250 to A–1, which deposited that amount in its bank account but did not remit to ATP. The invoice and purchase order were intentionally and knowingly altered by A–1, acting through its authorized agents, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo, to reflect the greater amount before the invoice was offered for sale to ATP.

b. A–1 invoice no. 1359 which when sold to ATP reflected an HSN order of 8,000 fire extinguishers at a total cost of $104,-000. ATP funded this amount on August 22, 1989. The purchase order number for these items was 21988. HSN records disclose that the fire extinguisher were shipped to it under invoice no. 1366, dated one month after invoice no. 1359. Invoice no. 1359 was never submitted to HSN. Invoice no. 1366 was not funded by ATP. No payment on either invoice has been made to ATP, although HSN paid A–1 the full amount on invoice no. 1366, an amount slightly greater than that funded by ATP on invoice no. 1359. The money owing to ATP was deposited in one of A–1's bank accounts.

c. A–1 invoice no. 1417 dated December 28, 1989, which when sold to ATP reflected an HSN order of 42,000 miscellaneous items at a total cost of $347,695. ATP funded this amount. HSN has no record of invoice no. 1417, but the same goods were shipped to HSN under invoice no. 1430, dated February 15, 1990. HSN paid A–1 directly for those goods and A–1, acting through Restivo and Santangelo, deposited

that amount in its bank accounts. A–1, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo never paid ATP for either invoice no. 1417 or 1430.

44. On purchased invoices nos. 1349, 1351, 1353, 1358, 1359 (actually, no. 1366, *see* ¶ 43(b)), 1399, 1417 (actually, no. 1430, *see* ¶ 43(c)), and 1419, HSN refused to accept all the goods shipped because of defects and damages. Thus, ATP was sold invoices by A–1, acting through Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo, that did not represent the actual sale and delivery of goods "finally accepted" by HSN. This was a violation of the accounts purchase agreement and the guarantees.

45. On purchased invoices nos. 1349, 1351, 1353, 1358, 1399, 1417 (actually, no. 1430, *see* ¶ 43(c)), and 1419, HSN did not pay the invoiced amount because of those defects, damages, and other price discrepancies. HSN remitted to A–1 less than the invoiced amount. ATP, although it had funded the invoiced amount, was not made aware of HSN's adjustments by A–1, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo. This was a violation of the accounts purchase agreement and the guarantees.

46. On purchased invoices nos. 1349, 1351, 1353, 1358, 1399, 1417 (actually, no. 1430, *see* ¶ 43(c)), and 1419, HSN did not pay the invoiced amount because of those defects, damages, and other price discrepancies. HSN remitted to A–1 less than the invoiced amount. Thus, ATP was sold invoices by A–1, acting through Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo, that did not represent the amounts "unconditionally owing" to A–1. This was a violation of the accounts purchase agreement and the guarantees.

47. HSN paid A–1 on the following invoices in the following amounts:

a. A–1 invoice no. 1349 paid by HSN check in the amount of $23,250;

b. A–1 invoice no. 1351 paid by HSN check in the amount of $326,168;

c. A–1 invoice no. 1353 paid by HSN checks totalling $901,468.50;

d. A–1 invoice no. 1358 paid by HSN check in the amount of $19,485;

e. A–1 invoice no. 1359 paid as invoice no. 1366 by HSN check in the amount of $108,460;

f. A–1 invoice no. 1399 paid by HSN check in the amount of $32,848.20;

g. A–1 invoice no. 1415 paid by HSN check in the amount of $205,575;

h. A–1 invoice no. 1417 paid as invoice nos. 1430 and 1430A by HSN checks totalling $274,403.93; and

i. A–1 invoice no. 1419 paid by HSN checks totalling $259,441.53.

48. As to each amount in ¶ 47, A–1 was obligated by the accounts purchase agreement either to remit the money to ATP or to hold it in trust for the benefit of ATP. A–1, acting through Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo, did neither.

49. In early December, 1989, Robert Taylor, the assistant vice-president at ATP, was given the responsibility of collecting A–1's overdue debt, which at the time was approximately $1,500,000.

50. Taylor and Jack Cassidy, on behalf of A–1, Kevin Cassidy, Restivo, and Santangelo, discussed alternative methods to resolve the delinquency.

51. On December 6, 1989, Taylor and Jack Cassidy, as an agent for A–1, Kevin Cassidy, Restivo, and Santangelo, spoke by telephone. In that conversation, Jack Cassidy admitted that A–1 had received payments directly from HSN and had not turned over those funds to ATP.

52. Jack Cassidy falsely stated that HSN was slow in paying on invoices because of shipping problems.

53. Jack Cassidy also requested that Taylor not contact HSN. I infer that Jack Cassidy did not want Taylor to contact HSN because he might have learned that HSN had consistently made payments directly to A–1 and had previously paid on invoices that A–1, acting through Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo, intended to re-issue and sell to ATP.

54. Jack Cassidy did not dispute the existence of the debt or its amount.

55. On December 6, 1989, Jack Cassidy, as an agent for A–1, Kevin Cassidy, Restivo, and Santangelo, sent a letter and eight post-dated checks to Taylor. The letter was transmitted by wire and by Federal Express with the eight checks enclosed.

56. During a telephone conversation on December 13, 1989, and memorialized by a letter of the same date, Taylor and Jack Cassidy, as an agent for A–1, Kevin Cassidy, Restivo, and Santangelo, agreed to work-out the delinquency by:

a. A–1's assigning to ATP $800,000 in new A–1 invoices, which ATP would not fund;

b. ATP's accepting the eight post-dated checks for the balance of the debt; and

c. A–1's notifying HSN to make all future payments on purchased invoices to ATP.

57. Jack Cassidy notified HSN by mail to send all payments for goods received to ATP.

58. On December 20, 1989, A–1 invoice nos. 1415, 1417, and 1419, totalling $819,030. were sent by mail to Taylor.

59. Taylor was instructed, by letter transmitted by wire and Federal Express on December 20, 1989, by Jack Cassidy, acting as an agent for A–1, Kevin Cassidy, Restivo, and Santangelo, to delay submitting the first check for $232,500. for a short time, while HSN verified its receipt of the goods and paid for them. That amount corresponded to the amount funded by ATP on invoice no. 1349, which was still owed to ATP by A–1. See ¶¶ 42(a) and 43(a).

60. Jack Cassidy knew, but Taylor and ATP did not know, that HSN had paid A–1 for those goods in July, 1989, and the funds had been deposited into A–1's Chase Manhattan Bank account.

61. Jack Cassidy also knew, but Taylor and ATP did not know, that HSN had only paid $23,250 on invoice no. 1349 because 1,500, not 15,000, Vatican coin sets had been ordered by and shipped to HSN. See ¶ 43(a).

62. A week later, after receiving Jack Cassidy's approval, ATP deposited the first post-dated check for $232,500 into its account. The check was returned for insufficient funds by A–1's bank.

63. ATP, again upon Jack Cassidy's approval, deposited the second post-dated check for $329,750 into its account. That amount corresponded to the amount funded by ATP on invoice no. 1351, which was still owed to ATP by A–1. See ¶ 42(b). The check never cleared because payment had been stopped by Restivo, acting as A–1's agent and with Santangelo's approval, on January 5, 1990. The check was returned by A–1's bank.

64. During a phone call in mid-January, 1990, Taylor learned from HSN that it had paid A–1 on invoice nos. 1349 and 1351 in June and July, 1989.

65. The other checks were never deposited by ATP.

66. No funds existed in A–1's Chase Manhattan bank account to cover those checks had they been submitted. The account had been closed by Restivo and Santangelo on January 15, 1990. Any funds that had been in that account were transferred to a new account opened at the same bank by Restivo and Santangelo.

67. On January 11, 1990, Jack Cassidy and Kevin Cassidy ceased to be associated with A–1. The reason for their departure is not germane to this proceeding at this juncture. Their split with the other defendants, however, has generated litigation in the New York state courts.

68. Restivo and Santangelo, as shareholders of A–1, commenced a damage action against Jack and Kevin Cassidy. Restivo and Santangelo charge that the Cassidys caused A–1 to be in default to its "factor" for $1,512,412.29, the exact amount owed to ATP at that time. Restivo and Santangelo also alleged that the Cassidys diverted A–1 assets and sent to the "factor" bills and invoices for items not shipped to account debtors. The action is still pending.

69. Restivo and Santangelo also filed a petition to dissolve A-1. By order of the New York court and with the consent of the four shareholders, A-1 has been dissolved and a receiver, Joseph A. Lichtenthal, Esquire, of White Plains, New York, has been appointed to collect and preserve A-1's remaining assets.

70. The receiver has chosen not to retain counsel for A-1 in this action. A-1 has not responded to the amended complaint. A-1 does not oppose the entry of a preliminary injunction against it.

71. On January 13, 1990, Restivo, on behalf of Santangelo and A-1, telephoned Taylor and told him that Jack and Kevin Cassidy had resigned and all files pertaining to ATP were missing from A-1's offices. Restivo informed Taylor that A-1 was still operating and that ATP would be paid.

72. On January 19, 1990, Taylor met with Restivo, Sheldon Eisenberger, Esquire (counsel for A-1 at the time, now counsel for Restivo and Premier), and Carmine Cornette, Santangelo's designated representative, in A-1's offices in New York. Those men told Taylor that they were attempting to locate the missing files and to verify the debt. They promised to keep ATP informed of their progress.

73. On that same day, Premier was incorporated. Its initial officers and directors were Restivo and Santangelo. Its shareholders are Santangelo and Restivo's wife.

74. In February, 1990, Taylor, Restivo, Santangelo, and Eisenberger met again. This time the meeting was held in Eisenberger's office in New York. Restivo, Santangelo, and Eisenberger suggested that the outstanding debt might be reduced if ATP worked with a new company.

75. Taylor did not object to this arrangement, or at least, he did not state any objection.

76. Restivo, Santangelo, and Eisenberger did not inform Taylor that, in fact, Premier had been incorporated on January 19, 1990.

77. From mid-January, 1990, to May, 1990, Restivo, Santangelo, and A-1 deposited over $400,000 into A-1's accounts. That amount is approximately the same as the amounts received from HSN as payments on invoice nos. 1419, 1430, and 1430A. That amount was distributed to Restivo, Santangelo, Premier, creditors other than ATP, and third parties to pay for the personal expenses of Restivo and Santangelo.

78. In 1989, Jack Cassidy received A-1 shareholder distributions totalling $510,-000, $90,000 of which he received after and during A-1's delinquency to ATP. He also received $25,755.06 in salary from A-1 between November, 1989, and January, 1990.

79. In 1989, Kevin Cassidy received A-1 shareholder distributions totalling $558,-396, $135,000 of which he received after and during A-1's delinquency to ATP. He also received $28,419.34 in salary from A-1 between November, 1989, and January, 1990.

80. In 1989, Restivo received A-1 shareholder distributions totalling $525,000, $105,000 of which he received after and during A-1's delinquency to ATP. He also received $29,934.16 in payroll payments between November 1, 1989, and February 23, 1990.

81. In 1989, Santangelo received A-1 shareholder distributions totalling $545,-000, $155,000 of which he received after and during A-1's delinquency to ATP. He also received $30,000 in salary from A-1 in November and December, 1989.

82. In 1989 and 1990, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo received over $2,000,000 from A-1. The following chart summarizes the approximate amount of money received by each defendant as shareholder distributions, shareholder distributions received by defendants during the period of A-1's delinquency, and payroll payments between November, 1989, and February 23, 1990:

| | '89–90 sh. dist | deling. sh. dist. | pay |
|---|---|---|---|
| J. Cassidy: | $ 510,000 | $ 90,000 | $ 25,755.06 |
| K. Cassidy: | 558,396 | 135,000 | 28,419.34 |
| Restivo: | 525,000 | 105,000 | 29,934.16 |
| Santangelo: | 545,000 | 155,000 | 30,000.00 |
| Total: | 1,665,896 | 485,000 | 114,108.56 |

83. Additionally, during 1989 and 1990, while A–1 was in debt to ATP, A–1, at the request of and with the authorization and approval of Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo, made the following payments, *inter alia*, to:

a. Thomas Cahill and Garrity & Levin, attorneys who represented Kevin Cassidy in personal matters, by checks dated May 8, 1989, for $13,115 and $4,097.50, respectively;

b. Yellow Freight System, Inc. and Tilden Commercial Alliance, Inc., by checks dated July 25, 1989, for $1,391.62 and $947.19, respectively;

c. Richard M. Speer, by check dated July 25, 1989, for $40,000, as partial payment for Kevin Cassidy's yacht;

d. Sheldon Eisenberger, by checks issued in January and February, 1990, totalling $43,000.;

e. various creditors and third parties for payment of the shareholders' personal expenses, including payments on a Rolls Royce, a Jaguar, and a Mercedes Benz, for car repairs, for chauffeured limousines, for travel in Florida and abroad, and on credit card bills;

f. bank accounts in Switzerland, purportedly held by Logan Financial, an A–1 creditor, by wire transfer on January 17, 1990;

g. the designation "cash" by a check dated October 10, 1989, for $1,000 with the words "trip to Ireland, Galway Crystal" on the corresponding check stub;

h. the designation "cash" by a check dated September 27, 1989, for $3,000, with the description "T & E" (I infer those initials to stand for "Travel & Entertainment") on the corresponding check stub;

i. Term Enterprises, Inc. by check dated August 21, 1989, for $10,000 to repay a loan made to Kevin Cassidy;

j. Capitol Check Cashing by check dated December 5, 1989, for $25,000 as a loan. Capitol Check Cashing was owned by A–1 and its shareholders; and

k. Dora Dobbs, Inc. by check dated August 21, 1989, for $25,000 as a loan. A–1, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo were the shareholders of Dora Dobbs. Dora Dobbs was located in A–1's offices in New York.

84. As of October 24, 1990, the outstanding delinquency to ATP stood at $2,055,198.57, including interest.

85. ATP has lost its source of financing and is no longer operating.

86. Under the terms of the accounts purchase agreement, A–1, and its authorized agents, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo, were obligated to hold in trust for the benefit of ATP payments received from HSN.

87. The accounts purchase agreement created a trust for the benefit of ATP over all payments received by A–1 from HSN. Under the accounts purchase agreement, these payments were to be forwarded to ATP or its lockbox. Instead, the funds were disbursed by and to Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo.

88. Under the terms of the guarantees, which provide that all payments received by A-1 would be forwarded to ATP in accordance with the accounts purchase agreement and that A-1 and the guarantors would not divert such payments in contravention of the accounts purchase agreement, Jack Cassidy, Kevin Cassidy, and Restivo, were obligated to hold in trust for the benefit of ATP payments received from HSN.

89. The guarantees created a trust for the benefit of ATP over the payments received by A-1 from HSN. Instead of being held in trust and forwarded to ATP in accordance with the accounts purchase agreement, these funds were disbursed by and to Jack Cassidy, Kevin Cassidy, and Restivo.

90. Under the terms of the security agreement, A-1, and its authorized agents, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo, were obligated to hold in trust for the benefit of ATP payments received from or goods returned by HSN and all other security pledged by A-1.

91. The security agreement created a trust over the payments received by A-1 from HSN and disbursed by and to Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo.

92. Jack Cassidy, Kevin Cassidy, Restivo, Santangelo, and Premier have each unjustly received from A-1 monies that each was obligated to hold in trust for the benefit of ATP.

93. A-1, Jack Cassidy, Kevin Cassidy, Restivo, Santangelo, and Premier have caused and benefitted by payments to third parties of monies that each should have held in trust for the benefit of ATP.

94. None of the defendants have held in trust for the benefit of ATP the assets each received from A-1.

95. None of the defendants have remitted assets they were obligated to hold in trust for the benefit of ATP to ATP.

96. A-1 diverted and transferred its assets to its shareholders, to third parties, and to Premier.

97. Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo caused A-1's assets to be diverted and transferred to the shareholders, to third parties, and to Premier.

98. A-1 became insolvent at the end of 1989.

99. A-1 is insolvent and unable to pay creditors.

100. A-1 was incurring debt and was unable to pay its creditors, including ATP, at a time when A-1, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo were distributing A-1's assets to themselves, to third parties, and to Premier.

101. A-1 was left with unreasonably small capital as a result of the distribution of its assets by A-1, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo to themselves, to third parties, and to Premier.

102. A-1, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo have failed and refused to permit ATP to inspect and review A-1's corporate books and records.

103. A-1, Jack Cassidy, Kevin Cassidy, Restivo, Santangelo, and Premier knew of and agreed to participate in the acts and activities that are described in these findings of fact and conclusions of law.

104. Between March 1, 1988, and mid-January, 1990, A-1, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo acted as agents for each other. Each defendant was authorized to transact affairs for and on behalf of each other defendant.

105. From mid-January, 1990, through the present, A-1, Restivo, Santangelo, and Premier acted as agents for each other. Each defendant was and is authorized to transact affairs for and on behalf of each other defendant.

106. ATP rightfully believed that A-1, Jack Cassidy, Kevin Cassidy, Restivo, Santangelo, and Premier were authorized to transact affairs for and on behalf of each other defendant.

107. From March 1, 1988, through the present, A-1, Jack Cassidy, Kevin Cassidy, Restivo, Santangelo, and Premier conspired together with the common purpose to defraud ATP out of its assets for their own personal gain.

## CONCLUSIONS OF LAW

1. Subject matter jurisdiction is vested in this court pursuant to 28 U.S.C. §§ 1331 and 1332, and 18 U.S.C. § 1961. Venue is properly laid in this court under 28 U.S.C. § 1391 and 18 U.S.C. § 1965.

2. ATP established that: (1) A–1, acting through Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo, breached the accounts purchase agreement; (2) Jack Cassidy, Kevin Cassidy, and Restivo breached their guarantees; (3) A–1, acting through Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo, breached the security agreement; (4) A–1, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo violated a trust created by the terms of the accounts purchase agreement; (5) Jack Cassidy, Kevin Cassidy, and Restivo violated a trust created by the terms of their guarantees; (6) A–1, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo violated a trust created by the terms of the security agreements; (7) the imposition of a constructive trust over the funds received by A–1 from HSN and distributed to A–1, Premier, Jack Cassidy, Restivo, and Santangelo is warranted and necessary to protect ATP; (8) Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo, in their individual capacity, each tortiously interfered with the contracts between ATP and A–1; (9) A–1, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo, in their individual capacity, each tortiously interfered with the contractual obligations owed by HSN to ATP; (10) A–1, Premier, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo committed fraud on ATP; (11) Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo caused A–1 to contravene New York's fraudulent conveyance statutes; and (12) A–1, Premier, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo violated RICO'S civil provisions, 18 U.S.C. §§ 1962(a), (b), (c), and (d).

3. Specifically, A–1, acting through Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo, breached the accounts purchase agreement by knowingly and intentionally:

a. selling invoices to ATP that have not been paid in full by HSN or, alternatively, by A–1;

b. selling invoices, such as invoice nos. 1349, 1351, 1359, and 1417, to ATP that did not represent bona fide sales of merchandise to HSN;

c. altering invoice no. 1349 to reflect a greater shipment of merchandise to HSN than had actually been shipped to it;

d. selling invoices to ATP representing goods that had not been "finally accepted" by HSN;

e. making false representations to ATP that invoice nos. 1349 and 1351 had not been paid by HSN when, in fact, HSN had paid for the goods sold under those invoices months before;

f. selling invoices to ATP for which A–1 had already been paid by HSN;

g. selling invoices to ATP that did not reflect amounts "unconditionally owing" to A–1 from HSN;

h. failing to notify ATP of disputes over merchandise between A–1 and HSN;

i. notifying HSN to pay A–1 instead of ATP or ATP's lockbox;

j. failing to hold payments received from HSN in trust for the benefit of ATP;

k. failing to remit to ATP assets received from HSN in trust for the benefit of ATP;

l. refusing to permit ATP to inspect A–1's corporate books and records; and

m. failing to repurchase invoices purchased by ATP that were not paid in full on or before their respective due dates by paying the amount owed immediately to ATP.

4. Jack Cassidy, Kevin Cassidy, and Restivo breached their guarantees by knowingly and intentionally:

a. causing and permitting A–1's breach of the accounts purchase agreement as described in ¶ 3 of these conclusions of law.

b. failing to rectify A–1's breach of the accounts purchase agreement as described in ¶ 3 of these conclusions of law.

c. ensuring that HSN would pay A–1 rather than ATP or ATP's lockbox;

d. failing to cause A–1 to hold payments received from HSN in trust for the benefit of ATP;

e. failing to cause A–1 to remit to ATP payments received from HSN;

f. receiving money from A–1 that A–1 was legally obligated to hold in trust for the benefit of ATP;

g. failing to hold in trust for the benefit of ATP money received from A–1;

h. failing to remit to ATP payments received from A–1;

i. permitting the officers, employees, and agents of A–1 to commit fraud, deceit, or criminal acts in connection with the transactions under the accounts purchase agreement;

j. committing fraud, deceit, or criminal acts in connection with the transactions under the accounts purchase agreement; and

k. failing to satisfy A–1's debt to ATP.

■ 5. A–1, acting through Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo, breached the security agreement by failing to hold all acquired accounts, all general intangibles, all contract rights, all chattel paper, and all other instruments in trust for the benefit of ATP.

■ 6. A–1 violated a trust, created by the terms of the accounts purchase agreement, by knowingly and intentionally:

a. failing to hold payments received from HSN in trust for the benefit of ATP;

b. failing to remit payments received from HSN in trust for the benefit of ATP:

■ 7. Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo violated a trust, created by the terms of the accounts purchase agreement, by knowingly and intentionally:

a. failing to cause A–1 to hold payments received from HSN in trust for the benefit of ATP;

b. failing to cause A–1 to remit to ATP payments received from HSN which A–1 was obligated to hold in trust for the benefit of ATP:

c. receiving money from A–1 that A–1 was legally obligated to hold in trust for the benefit of ATP;

d. failing to hold money received from A–1 in trust for the benefit of ATP; and

e. failing to remit money received from A–1 to ATP.

■ 8. Jack Cassidy, Kevin Cassidy, and Restivo violated a trust, created by the terms of their guarantees, by knowingly and intentionally:

a. failing to cause A–1 to hold payments received from HSN in trust for the benefit of ATP;

b. failing to cause A–1 to remit to ATP payments received from HSN which A–1 was obligated to hold in trust for the benefit of ATP:

c. receiving money from A–1 that A–1 was legally obligated to hold in trust for the benefit of ATP;

d. failing to hold money received from A–1 in trust for the benefit of ATP; and

e. failing to remit money received from A–1 to ATP.

■ 9. A–1, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo violated a trust, created by the terms of the security agreement, by failing to hold in trust for the benefit of ATP assets granted to ATP as security.

10. ATP did not waive any rights under or benefits of the accounts purchase agreement, the security agreement, or the guarantees.

11. The summary of financing was not a new agreement. It did not materially modify or rescind the accounts purchase agreement, the security agreement, or the guarantees. It was not a novation or a substitution.

12. The accounts purchase agreement, the security agreement, and the guarantees remained in full force and effect throughout the transactions described in these findings of fact and conclusions of law. The accounts purchase agreement, the security

**574**

agreement, and the guarantees are enforceable.

■ 13. The imposition of a constructive trust over the assets that should have been held in trust for the benefit of ATP but were unjustly received as shareholder distributions and payroll payments by Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo is warranted and necessary for the protection of ATP.

14. A–1, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo knowingly and intentionally converted assets that should have been held in trust for the benefit of ATP for their own use.

15. A–1, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo knowingly and intentionally dissipated assets that should have been held in trust for the benefit of ATP through payments to Premier.

16. A–1, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo knowingly and intentionally dissipated assets that should have been held in trust for the benefit of ATP through payments to third parties to cover their personal expenses.

17. A–1, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo knowingly and intentionally disbursed assets that should have been held in trust for the benefit of ATP to third parties outside the jurisdiction of this court.

18. A–1, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo knowingly and intentionally converted, dissipated, and disbursed assets that should have been held in trust for the benefit of ATP to frustrate and defeat ATP's collection efforts.

19. A–1, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo knowingly and intentionally converted, dissipated, and disbursed assets that should have been held in trust for the benefit of ATP to defraud ATP.

20. ATP has shown that it is probable that A–1, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo, if permitted, will continue to convert, dissipate, and disburse those assets that should have been held in trust for the benefit of ATP.

21. Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo, in their individual capacities, intentionally and improperly interfered with contracts between ATP and A–1 by causing A–1 to be unable to perform its contractual obligations.

22. A–1 and Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo, in their individual capacities, intentionally and improperly interfered with ATP's contractual right to payment from HSN by causing HSN to make payments to A–1 and by causing A–1 to be unable to perform its contractual obligation to remit those payments to ATP.

23. A–1, acting through Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo, and Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo committed fraud by:

a. knowingly selling altered or false invoices to ATP;

b. knowingly selling invoices to ATP for which A–1 had been previously paid by HSN;

c. falsely promising ATP that A–1's debt would be paid in full when, in fact, they did not intend to pay on the debt;

d. providing post-dated checks to ATP knowing that there would not be sufficient funds in the accounts to cover them;

e. knowingly converting assets that should have been held in trust for the benefit of ATP; and

f. falsely representing to ATP that the terms of the accounts purchase agreement, the security agreement, and the guarantees would be followed.

24. In view of the knowing and intentional conversion, dissipation, and dispersal of assets that A–1, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo were legally obligated to hold in trust for the benefit of ATP and their acts of fraud, the imposition of a constructive trust over all of the assets of A–1, Jack Cassidy, Kevin Cassidy, Restivo, Santangelo, and Premier is warranted and necessary for the protection of ATP.

■ 25. Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo caused A–1 to vio-

late New York Debtor & Creditor Law § 273 by conveying its assets to its shareholders, to third parties and to Premier without fair consideration. These actions rendered A–1 insolvent and continued to occur while it was insolvent.

26. Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo caused A–1 to violate New York Debtor & Creditor Law § 274 by conveying its assets to its shareholders, to third parties, and to Premier without fair consideration. These actions left A–1 with unreasonably small capital.

27. Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo intentionally caused A–1 to violate New York Debtor & Creditor Law § 275 by conveying its assets to its shareholders, to third parties, and to Premier. Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo knew A–1 had incurred and would incur debt to ATP and other creditors beyond A–1's ability to pay those debts as they matured.

28. Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo knowingly caused A–1 to violate New York Debtor & Creditor Law § 276 by conveying its assets to its shareholders, to third parties, and to Premier. Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo acted with the intent to hinder, delay, and defraud ATP.

29. ATP is entitled to injunctive relief under New York Debtor & Creditor Law § 278, to the extent necessary to satisfy its claims, by setting aside or annulling all conveyances of A–1's assets without fair consideration to Jack Cassidy, Kevin Cassidy, Restivo, Santangelo, third parties, and Premier, or by disregarding the conveyances without fair consideration and attaching or levying execution upon the assets of Jack Cassidy, Kevin Cassidy, Restivo, Santangelo, third parties, and Premier.

30. In view of the conveyance of A–1's assets without fair consideration by A–1, acting through Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo, the imposition of a constructive trust over all the assets of A–1, Premier, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo is warranted and necessary for the protection of ATP.

31. ATP established its claims under 18 U.S.C. §§ 1962(a), (b), (c), and (d) asserted against A–1, Premier, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo.

32. The association-in-fact of A–1, Premier, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo constitutes an enterprise under 18 U.S.C. § 1961(4).

33. The enterprise was engaged in and its activities as described in these findings of fact and conclusions of law affected interstate and foreign commerce.

34. A–1, Premier, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo, with a common purpose to defraud ATP, agreed to and conspired to commit acts in violation of 18 U.S.C. § 1962(d).

35. A–1, Premier, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo engaged in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

36. A–1, Premier, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo performed acts in furtherance of and comprising the pattern of racketeering activity.

37. ATP has shown with a reasonable probability of success that A–1, Premier, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo committed acts of mail fraud in violation of 18 U.S.C. §§ 1341 and 2.

38. ATP has shown with a reasonable probability of success that A–1, Premier, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo committed acts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2.

39. ATP has shown with a reasonable probability of success that A–1, Premier, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo committed acts of interstate transportation of securities obtained by fraud in violation of 18 U.S.C. §§ 2314 and 2.

40. ATP has shown with a reasonable probability of success that, if permitted, the acts in furtherance of and comprising the pattern of racketeering activity would continue in the future.

41. A–1, Premier, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo received

income derived from the pattern of racketeering activity and used or invested that income in the operations of the enterprise and its affairs in violation of 18 U.S.C. § 1962(a).

42. A-1, Premier, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo acquired or maintained an interest in or control of the enterprise from the pattern of racketeering activity in violation of 18 U.S.C. § 1962(b).

43. ATP has shown that it has been injured by a violation of 18 U.S.C. § 1962, by the predicate acts which formed the pattern of racketeering activity and by the pattern of racketeering activity.

44. ATP will suffer irreparable injury if A-1, Premier, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo are permitted to convert, dissipate, and disburse assets that defendants were legally obligated to hold in trust for the benefit of ATP.

45. An unsatisfied money judgment against A-1, Premier, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo is probable unless ATP is granted its motion for a preliminary injunction.

46. ATP does not have an adequate remedy at law to ensure the payment of the debt owing to it by A-1, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo.

47. ATP does not have any other means of obtaining or securing the availability of the monetary relief it seeks from A-1, Premier, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo other than through the injunctive relief described in the accompanying order.

48. A preliminary injunction is necessary to prevent the further conversion, dissipation, and disbursement of assets belonging to ATP by A-1, Premier, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo.

49. The balance of hardships weighs in favor of granting the requested injunctive relief.

50. The public interest is best served by preventing A-1, Premier, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo from the further conversion, dissipation, and disbursement of assets that should have been held in trust for the benefit of ATP.

51. ATP is entitled to the injunctive relief described in the accompanying order.

52. ATP is entitled to injunctive relief freezing the assets of A-1, Premier, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo in such amounts as may be necessary to satisfy a judgment of $2,055,198.57 plus interest at the rate of 18% per annum from October 24, 1990, to the present, costs, attorney's fees, and other charges pursuant to the accounts purchase agreement, the security agreement, and the guarantees.

53. This relief is reasonably related to the likely value of the expected judgment, absent treble damages available under RICO, against A-1, Premier, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo. The sum is calculated to approximate the amount of the debt owed to ATP plus interest, costs, attorney's fees, and other charges required under the accounts purchase agreement, the security agreement, and the guarantees.

54. It is necessary for ATP to post security for the entry of the injunctive relief described in the accompanying order.

An order follows.

## ORDER

AND NOW, this 11th day of February, 1991, it is hereby ordered that:

1. Plaintiff's motion for a preliminary injunction is granted;

2. A hearing is scheduled for February 26, 1991, at 2:00 p.m., in courtroom 6A.

3. At the hearing, the parties shall submit a joint plan for the implementation and coordination of injunctive relief. That plan shall include provisions for:

a. the establishment and maintenance of an escrow account for plaintiff's benefit in a federally insured commercial bank of plaintiff's choosing located in this district;

b. the periodic reporting of transactions in the escrow account to the court;

c. directing account debtors of Premier and A-1 to make payments to the escrow account;

d. the payment of money into the escrow account by account debtors, plaintiff (if it receives money from an account debtor), or defendants;

e. the release of money to plaintiff, defendants, or third parties;

f. the periodic reporting of plaintiff's costs, attorney's fees, and interest accrued on the outstanding delinquency;

g. the amount of money needed by defendants to operate in the ordinary course of business;

h. any extraordinary expenditures by defendants;

i. the transfer or conveyance of assets in the ordinary course of business by defendants to third parties;

j. the prompt payment to the escrow account by defendants of any assets received on all purchased and non-purchased accounts; and

k. the application for additional or modified injunctive relief.

4. The joint proposed plan may include provisions for the appointment of a special master to administer the transactions under this injunction.

5. Effective immediately, A-1, Jack Cassidy, Kevin Cassidy, Restivo, Santangelo, and Premier shall direct all of Premier's or A-1's account debtors to make payments to no entity or person other than plaintiff or the escrow account.

6. Effective immediately, A-1, Jack Cassidy, Kevin Cassidy, Restivo, Santangelo, and Premier shall direct debtors of Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo to make payments of principal, interest, dividends, fees, costs, penalties, awards, prizes, and distributions in kind to plaintiff or the escrow account.

7. Effective immediately, A-1, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo shall comply with the terms and obligations of the accounts purchase agreement.

8. Effective immediately, A-1, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo shall comply with the terms and obligations of the security agreement.

9. Effective immediately, Jack Cassidy, Kevin Cassidy, and Restivo shall comply with the terms and obligations of their guarantees.

10. Effective immediately, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo shall not interfere with any contract between plaintiff and A-1.

11. Effective immediately, A-1, Jack Cassidy, Kevin Cassidy, Restivo, and Santangelo shall not interfere with any contract between plaintiff and a third party.

12. Effective immediately, A-1, Jack Cassidy, Kevin Cassidy, Restivo, Santangelo, and Premier are prohibited from transferring, disposing, encumbering, using, selling or converting their assets, until further order of this court.

13. Paragraph 12 of this order shall not apply to any defendant who deposits $2,055,198.57 plus interest at the rate of 18% per annum from October 25, 1990, to the present, costs, attorney's fees, and other charges required under the relevant contracts in a segregated escrow account, wherein withdrawals may be made only with this court's approval, at a federally insured commercial bank in the name of plaintiff. Immediately upon deposit, that defendant shall provide to plaintiff and to the court the identification and location of the account.

14. A-1, Jack Cassidy, Kevin Cassidy, Restivo, Santangelo, and Premier shall have four days from the date of this order to identify for the court and for plaintiff's counsel any and all bank accounts, money market accounts, stock trading accounts, personal or real property in which they have any interest, in whole or in part, in a personal or representative capacity wherever located in this country or abroad. The information shall cover the period between March, 1988, and the date of this order.

15. A-1, Jack Cassidy, Kevin Cassidy, Restivo, Santangelo, and Premier shall have ten days from the date of this order

to produce at the offices of plaintiff's counsel for inspection and photocopying by plaintiff or its counsel, all books, records, and financial documents relating to the above described accounts or property. The information shall cover the period between March, 1988, and the date of this order.

16. A-1, Jack Cassidy, Kevin Cassidy, Restivo, Santangelo, and Premier each shall have ten days from the date of this order to submit individual balance sheets prepared by a certified public accountant.

17. A-1, Jack Cassidy, Kevin Cassidy, Restivo, Santangelo, and Premier shall have ten days from the date of this order to produce at the offices of plaintiff's counsel for inspection and photocopying by plaintiff or its counsel, A-1's books and records, financial records and documents, and current balance sheet, a description of all assets owned by A-1 and their approximate value, a list of A-1's account debtors, all documents relating to A-1's account debtors, including but not limited to accounts receivable statements, invoices, letters, or contracts, and a list of outstanding account balances or debts owing to A-1 by third parties. The information shall cover the period between March, 1988, and the date of this order.

18. Upon receipt of any payment from an account debtor or a third party on behalf of one of the defendants before the escrow account is opened, plaintiff shall immediately inform the court and place that money in a segregated account at a federally insured commercial bank.

19. After the escrow account is opened, plaintiff shall immediately transfer to the escrow account any money it has received from an account debtor or a third party on behalf of one of the defendants to the escrow account.

20. Plaintiff shall within four days of the date of this order notify all banks, money market funds, stock trading funds, stock brokers, partnerships, corporations, and any other entity in which each defendant has an account or interest, in whole or in part, in a personal or representative capacity wherever located in this country or abroad (of which plaintiff is aware) that defendant's assets have been frozen by court order and shall remain frozen until further order of court.

21. Prior to relating the contents of this order to their clients, defense counsel shall notify all banks, money market funds, stock trading funds, partnerships, corporations, and any other entity in which their client has an account or interest, in whole or in part, in a personal or representative capacity wherever located in this country or abroad (of which defense counsel is aware) that their client's assets have been frozen by court order and shall remain frozen until further order of court. Defense counsel shall within four days of the date of this order file a certificate of service on these entities.

22. This order shall be effective upon the giving of security by plaintiff in the amount of $1,000, in cash, check, or bond, for the payment of costs or damages as may be incurred by a defendant who is later found to have been wrongfully enjoined or restrained.

23. This order is not a final order. A final order pertaining to plaintiff's motion for preliminary injunction will be issued at a later date after the submission of the joint proposed plan for the implementation and coordination of injunctive relief.

## EXHIBIT 1

American Trade Credit Corp.

Subsidiary of Butcher Industries. Inc.

211 South Broad Street
Philadelphia. Pennsylvania 19107

(215) 985-5146

### Accounts Purchase Agreement

Gentlemen:

This Agreement states the terms and conditions upon which you agree to purchase certain of our accounts.

SALE OF ACCOUNTS

1. We hereby agree to sell and assign to you as absolute owner, and you hereby agree to purchase from time to time at your sole discretion from us, with limited recourse to us as set forth in this Agreement, all our right, title, and interest in and to certain accounts, insured by American Credit Indemnity Company (hereinafter referred to as "ACI"), and identified in certain executed Certificates of Assignment ("Certificates") in the form of Exhibit "A" attached hereto, and any and all general intangibles, contract rights, chattel paper, and instruments derived therefrom or related thereto and all other obligations owing to us in connection with the sale of goods by us or the performance of services by us constituting the basis for the accounts assigned, and all books, records, and other property at anytime evidencing or related to the foregoing and all products and proceeds of any of the foregoing in any form including, without limitation, any claims against third parties for loss or damage to, or destruction of, any or all of the foregoing and credit and other insurance (all hereinafter collectively called the "Purchased Accounts") and all remedies, guaranties, security and liens in respect of the Purchased Accounts, including, without limitation rights of stoppage in transit, replevin, repossession and reclamation and all other rights and remedies of an unpaid vendor, lienor, or secured party and all rights of a loss payee and policyholder under the credit insurance policy; (ii) all goods relating to or which by sale result in the Purchased Account, including, without limitation, all returned, reclaimed or repossessed goods and (iii) all proceeds of the foregoing in any form, including, but not limited to, insurance proceeds. All of the foregoing are collectively referred to as the "Collateral".

2. From time to time we shall submit a list of accounts we wish to sell to you. Such list shall be made in the form of the Certificate signed by us and describing each account in detail, accompanied by any copies of the invoices, original contracts, purchase orders, bills of lading, evidence of shipment and such other documents and proof of delivery, evidencing and relating to the accounts listed on the Certificate ("Selected Accounts") as you may from time to time require. We shall also submit evidence acceptable to you of credit insurance coverage by ACI of the Selected Accounts along with a copy of the policy naming you and Fidelity Bank, National Association as loss payee as your and their interests may appear and letters (the "Letters") signed by us and addressed to each obligor, customer or debtor (the "Account Debtor") in any way obligated on or in connection with any Selected Account and directing the Account Debtors to make payment of their respective Selected Accounts to a particular lock box address to be designated by you. Your approval shall not be effective unless you confirm it to us in writing by signing the Certificate. You may withdraw your agreement to purchase at any time for any reason in your sole discretion before you actually advance payment to us for the Purchased Accounts. We shall also submit UCC-1 financing statements signed by us and in form and substance acceptable to you and UCC-3 releases in form and substance acceptable to you and signed by third parties claiming an interest in the Purchased Accounts.

3. Upon receipt of the Certificate with the aforementioned accompanying documents, you at your sole discretion shall determine which of the Selected Accounts you wish to purchase, if any. We will not sell to you: (a) any account which has remained unpaid for more than thirty days from its invoice date; (b) any account whose Account Debtor has 10 percent or more of its outstanding obligations due and owing to us for more than 90 days from the invoice date, (c) any account with respect to which a representation or warranty contained herein was not or does not continue to be true and accurate including without limitation any account which is subject to a potential set-off; (d) any account arising from a bill and hold sale or in connection with any prebillings, i.e. any account arising from the sale of goods or services that have not been delivered, performed by us or accepted by the Account Debtor; (e) any account in connection with which the Account Debtor reports that its balance as set forth as due and owing by us is incorrect; (f) any account arising from the sale of goods or services where either the perfection and enforceability or validity of your right, title and interest in such account or your right or ability to obtain direct payment to yourself of the proceeds of such account is governed by federal or state statutory requirements other than those of the Uniform Commercial Code, including but without limitation, any account subject to the Federal Assignment of Claims Act of 1940 as amended; (g) any account for which we are unable to obtain credit insurance coverage acceptable to you from ACI, (h) all accounts for which the term of payment exceeds sixty days from the date of invoice; (i) all accounts arising from a consignment arrangement for which the goods are returnable if not sold by the Account Debtor; (j) all accounts constituting partial billings and returns which provide that the Account Debtor need make no payment prior to full shipment or full performance, (k) any account with respect to all or part of which a check, promissory note, draft, trade acceptance or other instrument has been received, presented for payment, and returned uncollected for any reason; (l) any account on which we have extended the time for payment; (m) any account owed by any Account Debtor which does not maintain its chief executive office in the United States or which is not organized under the laws of the United States or any state; (n) any account of any Account Debtor which directly or indirectly is controlled by us or which either owns in whole or material part or directly or indirectly controls us; (o) any account to which any one or more of the following events occur with regard to the Account Debtor or any other party, primarily liable on the account, death or judicial declaration of incompetence, filing by or against any Account Debtor or guarantor thereof of a request or a petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as a bankrupt, or other relief under the bankruptcy and insolvency or similar laws of the United States, any state or territory thereof or any foreign jurisdiction now or hereafter in effect, the making of any general assignment by any Account Debtor for the benefit of creditors, the appointment of a receiver or trustee for any of the assets of an Account Debtor including but without limitation, the appointment or taking of possession by a custodian as defined by the United States Bankruptcy Code, the institution by or against any Account Debtor of any other type of insolvency proceeding under the bankruptcy laws of the United States or otherwise, or any formal or informal proceeding for the dissolution, liquidation or settlement of claims or winding up of affairs of any Account Debtor; the sale, assignment or transfer of all or any substantial part of the assets of the Account Debtor, the non-payment of any Account Debtor's debts as they become due, and the cessation of business of any Account Debtor as a going concern. No purchases or payments will be made by you if our financial condition in your judgment becomes unsatisfactory to you or so long as we are in default in our performance of any of our obligations to you hereunder or otherwise.

4. Upon your agreement to purchase certain of the Selected Accounts, a corrected Certificate shall be prepared and signed by us describing the Selected Accounts you have elected to purchase along with the documents as required above. You shall upon delivery of such Certificate and the filing of all financing statements and releases deemed necessary by you to obtain title to the Purchased Accounts free and clear of all encumbrances and conflicting claims, sign the Certificate and pay us by bank check or wire transfer the purchase price of the Purchased Accounts which price shall be set forth in the Certificate and which shall equal a percentage of the gross invoice amount of the Purchased Accounts less returns, credits, allowances and discounts on the shortest terms of sale offered by us on each Purchased Account (the "Net Purchase Price"). We shall, at your request, telephone the accounts payable clerk of each Account Debtor of each Purchased Account to direct said Account Debtor to make payment of all sums due under each Purchased Account to the lock box address set forth in the Letters accompanying the Certificate. If any Account Debtor shall make payment of its Purchased Account to other than the lock box as directed by you, we shall take all necessary steps to effect collection of such proceeds from any other party claiming an interest therein or having possession of the same and shall hold any

proceeds obtained by us on the Purchased Accounts in kind in trust for you and shall deliver such proceeds in kind to you through your lock box or as otherwise instructed by you. You may require as a further condition to the purchase of the Purchased Accounts, an intercreditor agreement with any other entity currently having or previously having a claim against some or all of our accounts which agreement shall provide for the safekeeping and delivery to you of any and all proceeds of Purchased Accounts which for any reason are forwarded to such entity by the Account Debtor or us.

## LIMITED RECOURSE

5. You shall have a full right of recourse against us for any and all Purchased Accounts which in any way are not in full compliance with the warranties and representations made herein or in the Certificate with regard to Purchased Accounts except that should the failure of any Account Debtor to pay its obligation to you be attributable entirely to said Account Debtor's "insolvency" as such term is defined in ACI's credit insurance policy you shall, or we shall on your behalf at your request, make claim against the credit insurance policy of ACI covering such Purchased Account. To the extent that ACI pursuant to such credit insurance policy does not pay to you the full amount of the unpaid balance of the amount due from the Account Debtor on the defaulted Purchased Account, we shall promptly upon your demand make payment to you of the difference between the amount paid by ACI to you and the unpaid balance of the delinquent Purchased Account. In connection with each Certificate and any credit insurance deficiency on any Purchased Account thereunder which deficiency is attributable to an allowable claim under the ACI policy but not payable because we have not met our minimum deductible under said policy, we will not be required to pay to you so much of the aggregate amount of such deficiencies as does not exceed the limit set forth in the Certificate for the Purchased Accounts listed therein, hereinafter referred to as the "Deductible Limit."

## WARRANTIES AND REPRESENTATIONS

6. We warrant, represent, guarantee and agree as follows: (a) We shall execute financing statements, affidavits and such other documents as you may request to verify your full title and interest in the Purchased Accounts and you shall have all of the ownership, title, rights, securities and guarantees with respect thereto and in respect to the property evidenced thereby free from any lien, security interest, claim or encumbrance of any kind, except in your favor and we shall defend the same against the claims of all persons; (b) each of the Purchased Accounts will be paid in full on or before their respective due dates as represented to you on the Invoices evidencing such Purchased Accounts and on the Certificates and if any Purchased Account is not paid on or before said due date, and you are unable to effect collection from ACI of the unpaid balance of the delinquent Purchased Account, we agree to repurchase such Purchased Account by paying any amount represented to be owing thereon immediately to you; (c) if any allowance or credit on any Purchased Account be given by us then we shall pay the same immediately to you if you so demand; (d) if any property evidenced by a Purchased Account should be returned to us then we will hold the same in trust for you as security for our obligations to you hereunder and subject to your orders and we will pay the amount represented to be owing on the related Purchased Account immediately to you; (e) every Purchased Account is and will be for a certain undisputed amount we represent to be owing thereon, and not be contingent upon the fulfillment of any contract or condition whatsoever; (f) at any time as you have a bona fide reason to deem your rights and title as assignee of the Purchased Accounts to be insecure, we will make proper entries in our internal books upon your request; (g) if we are in breach of any of the provisions of this Agreement or any Certificate or other instrument or agreement between you and us, upon your demand, we will open all mail only in the presence of your representative who may take therefrom any remittance on Purchased Accounts; (h) you and your agent or your representative are hereby constituted and designated as our attorney-in-fact with irrevocable power of attorney coupled with interest to endorse or sign our name on financing statements and remittances in respect to Purchased Accounts, to sign our name on invoices assignments notices to Account Debtors, bills of lading, storage receipts, checks, drafts or other instruments or documents in respect of the Purchased Accounts or the property covered thereby; (i) we will maintain such records with regard to the Purchased Accounts and the conduct and operation of our business as you may reasonably request and will furnish you or your agent all information with respect to the Purchased Accounts; (j) we will execute and deliver to you upon demand any additional instruments or documents and do all things deemed by you as necessary or desirable to carry into effect the provisions of this Agreement to evidence, protect and perfect the assignment of title to and credit insurance coverage on the Purchased Accounts and to facilitate the collection of the Purchased Accounts and insurance claims related thereto and we shall maintain all our books and records of Purchased Accounts at our principal place of business at: __350 Theodore Fremd Avenue, Rye, New York__

and shall not remove such records or relocate our principal place of business without your prior written consent which consent shall not be unreasonably withheld; (k) the name(s) under which we concluded the sale of goods or services constituting the basis for the Purchased Accounts __A 1 - International Importing Enterprises , Ltd.__ and said name(s) is either our correct name as set forth in our Articles of Incorporation (if we are a corporation) and if we are a proprietorship or partnership the proper name of the proprietor and partners, or a properly registered fictitious name or tradestyle on which we shall provide evidence to you of having filed the fictitious name with the appropriate state and local authorities in the jurisdictions in which we conduct our business; (1) no prior assignments nor any prior security interests have been made or granted in any of the Purchased Accounts to anyone other than yourself except as has been released by the parties holding such adverse interests in the Purchased Accounts prior to or contemporaneously with your purchase of such Purchased Accounts; (m) each and every Purchased Account will represent a bona fide indebtedness arising from the actual sale and delivery of goods or performance of services in the ordinary course of our business which has been finally accepted by the Account Debtor and which will be unconditionally owing to you in the amount and at the time stated in each invoice or document relating to the Purchased Account (which will not be changed without your written consent) in United States funds at par, without dispute, offset, deduction, defense or counterclaim of any kind, whether bona fide or otherwise; (n) all Purchased Accounts are accounts and are not and will not be evidenced by instruments or chattel paper except that which has been delivered to you or which you have created with the Account Debtor; and (o) that we have not sold to you any Purchased Account which is in contravention of Paragraph 3 hereof.

7. We covenant, represent and agree with and warrant to you as follows. (a) the execution and delivery of this Agreement and the Certificate and all other related documents are not in violation of our Articles of Incorporation or our Bylaws or any contractual obligations we have with any third party or any law, rule, regulation, court order or other obligation by which we or any of our assets are bound; the execution, performance, and delivery by us of this Agreement, the Certificate and all other related documents have been duly authorized by appropriate corporate action and we will deliver to you a written opinion of counsel as to the legal propriety of such action should you request the same; we will comply at all times with all laws, ordinances, rules, regulations of any public authority having jurisdiction of us or any part of our assets where such failure to comply would have a material adverse effect thereon. (b) we will pay you all reasonable attorneys' fees and expenses, including without limitation, court costs which may be

expended or incurred by you in enforcing or attempting to enforce any of your rights under this Agreement, the Certificate or any related documents and/or against any guarantors of the same and/or against any of our Account Debtors under the Purchased Accounts and in respect to any matter growing out of this Agreement, the Certificate, or any related documents, all of which costs and expenses if not repaid on demand together with any and all unpaid charges shall bear interest at the highest rate permitted by law; (c) we will keep our books and accounts in accordance with generally accepted accounting principles and you or your agent or any of your representatives from time to time may verify the Purchased Accounts, inspect, check, make, take copies of or extracts from our books, records and files and we will make the same available to you or its agents at any reasonable time for such purposes; (d) so long as this Agreement is operative, we will deliver to you quarterly and with any Certificate our most current consolidated financial and operating record and will deliver our audited annual consolidated financial report within 90 days after the end of our fiscal year including an unqualified opinion thereon in form acceptable to you by a firm of independent certified public accountants satisfactory to you; (e) we hereby authorize all duly constituted federal, state, and municipal authorities to furnish you copies of any reports of examinations of us made by them; (f) we will not pledge, mortgage or otherwise encumber any of the Purchased Accounts, or allow any of our corporate charters or franchises to lapse; (g) we will not merge or consolidate with any other corporation or sell, lease, transfer or otherwise dispose of our assets as an entity to any person, firm or corporation; (h) all financial data which we furnish to you will be taken from our books and records kept in accordance with generally accepted principles of accounting in the industry in which we are engaged and the balance sheet so furnished will reflect accurately our financial condition as of the date thereof.

## VALIDITY

8. In the event the enforceability or validity of any provision of this Agreement or any other agreement or document related thereto shall be challenged or questioned, such provision shall be covered by and shall be construed in accordance with whichever applicable federal law or Pennsylvania law will uphold or would enforce such challenged or questioned provision.

## MISREPRESENTATION

9 If we are declared to be in default by you in the performance of any of our obligations to you hereunder or otherwise or upon your discovery of any material misrepresentation by us, we shall be obligated to repurchase all the Purchased Accounts by immediately paying the outstanding unpaid balance of the Purchased Accounts whereupon you shall reassign the Purchased Accounts to us and thereupon you will pay to us any proceeds from the collection of Purchased Accounts you may have received after you have received payment in full from us, providing there are no subsequent lienors claiming an interest therein.

## ASSIGNMENT

10 We waive notice of non-payment, protest, and all other notices to which we might be entitled except as herein expressly provided. You may assign and transfer to any entity our obligations to you and delegate your duties hereunder and may assign and transfer your interest in the Purchased Accounts and all rights under this Agreement as collateral security for any and all indebtedness you may owe to others Such transferee will have the same rights and title with respect to this Agreement and the Purchased Accounts as are herein given to you.

## PERFECTION

11. We shall, at our expense, perform all acts and execute all documents requested by you at any time to evidence, perfect, maintain and enforce your right, title and interest in the Collateral and the priority thereof. Upon your request, at any time and from time to time, we shall execute and deliver to you one or more financing statements (in form and substance satisfactory to you) and, where permitted by law, we hereby authorize you to execute and file one or more financing statements signed only by you We hereby authorize you to file photocopies of this executed Agreement as financing statements at your discretion.

## REMEDIES

12 All of our obligations to you hereunder or otherwise, at your option, shall be due and payable without notice or demand upon termination of this Agreement or upon the occurrence of any one or more of the following events of default ("Default"): (a) if we shall fail to pay to you when due any amounts owing to you hereunder or otherwise; (b) if we shall breach any of the terms, covenants, conditions or provisions of this Agreement or any other agreement between us; (c) if any representation, warranty, or statement of fact made to you at any time by us or on our behalf is false or misleading in any material respect; (d) if we shall become insolvent, fail to meet our debts as they mature, call a meeting of creditors or have a creditors' committee appointed, file or have filed against us a petition in bankruptcy, arrangement or reorganization, or if we suspend or discontinue doing business for any reason, or if we make an assignment for the benefit of creditors, or if a receiver or trustee of any kind is appointed for us or any of our property. Upon the occurrence of any Default you shall have, in addition to all of your rights and remedies under this Agreement, the rights and remedies in and to the Collateral of a secured party under the Uniform Commercial Code of the Commonwealth of Pennsylvania ("UCC") or other applicable law

13. Each of your rights and remedies under this Agreement is not intended to be exclusive, and such rights and remedies are in addition to and not by way of limitation of any other rights or remedies you may have under the UCC or other applicable law. You shall have the right, in your sole discretion, to determine which rights and remedies, and in which order any of the same, are to be exercised, and to determine which Collateral is to be setoff and applied toward the payment of which of our obligations to you or otherwise proceeded against and in which order, and the exercise of any right or remedy shall not preclude the exercise of any others, all of which shall be cumulative. No act, failure or delay by you shall constitute a waiver of any of your rights and remedies. No single or partial waiver by you of any provision of this Agreement, or breach or default thereunder, or of any right or remedy which you may have, shall operate as a waiver of the same or any other provision, breach, default, right or remedy on a future occasion. We waive presentment, notice of dishonor, protest and notice of protest of all instruments included in or evidencing any of our obligations to you or the Collateral and of any and all notices or demands whatsoever except as expressly provided for herein. The net proceeds resulting from the exercise of any of your rights or remedies shall be applied to the payment of our obligations to you in such order as you may elect. We shall remain liable to you for any deficiency.

14. Any goods which are returned by Account Debtors or otherwise recovered will be your property; they shall be set aside and held by us as your trustee, to be disposed of in accordance with your instructions We shall notify you promptly of all such returns and recoveries and of all disputes and claims by Account Debtors relating in any way to the Purchased Accounts. If any dispute or claim is not promptly settled by us without loss or expense to you, you may litigate the same or settle it directly with the Account Debtor on such terms and as you deem advisable; and if you demand that the Purchased Account affected thereby be repurchased

by us. you will credit us with the net amount of cash received by you, after payment of all costs and expenses including court costs and attorneys' fees. We waive presentment and protest of all instruments and notice thereof, notice of default and dishonor and all other notices to which we may otherwise be entitled

### EFFECTIVE DATE, TERM AND TERMINATION

15. This Agreement shall become effective upon acceptance by you and shall continue in full force and effect until terminated by either of us giving to the other at least thirty (30) days prior written notice of termination by registered or certified mail You shall have the right to terminate this Agreement immediately at any time and without notice upon the occurrence of any Default. Termination, however, shall not relieve or discharge us of our duties, obligations or covenants hereunder until all of our obligations to you have been paid in full, and all of the terms, provisions and conditions of this Agreement, including, without limitation, your continuing right, title and interest and other rights and remedies in and to the Collateral shall remain in effect If after receipt of any payment of all or any part of our indebtedness hereunder, you are for any reason compelled to surrender such payment to any person or entity, because such payment is determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason, this Agreement shall continue in full force and we shall be liable to, and shall indemnify and hold you harmless for, the amount of such payment surrendered. The provisions of this Paragraph shall be and remain effective notwithstanding any contrary action which may have been taken by you in reliance upon such payment and any such contrary action so taken shall be without prejudice to your rights under this Agreement and shall be deemed to have been conditioned upon such payment having become final and irrevocable. The provisions of this Paragraph shall survive the termination of this Agreement.

### CONTROLLING LAW AND JURISDICTION

16 This Agreement and all transactions thereunder shall be deemed to be consummated in the Commonwealth of Pennsylvania and shall be governed by and interpreted in accordance with the laws of such State. If any part or provision of this Agreement is held to be invalid or in contravention of any applicable law or regulation, such part or provision shall be severable without affecting the validity of any other part or provision of this Agreement. In no event shall your charges payable by us under this Agreement exceed the rate permitted under any applicable law or regulation, and if any part or provision of this Agreement is in contravention of any such law or regulation, such part or provision shall be deemed amended to conform thereto No provision of this Agreement may be modified or amended orally or by course of conduct but only by a written instrument signed by both of us. This Agreement shall be for the benefit of and binding upon our respective successors and assigns.

17 We hereby waive all rights to a trial by jury in the event of any litigation with respect to any matter connected with this Agreement, our obligations to you, the Collateral or any other transaction between us and we hereby irrevocably consent to the jurisdiction of the Courts of the Commonwealth of Pennsylvania and of any Federal Court located in such Commonwealth in connection with any action or proceeding arising out of or relating to this Agreement, our obligations to you, the Collateral or any such other transaction. In any such litigation we waive personal service of any summons, complaint or other process and agree that service thereof may be made by certified or registered mail directed to us at our address set forth below. Within 30 days after such mailing, we shall appear in answer to such summons, complaint or other process, failing which we shall be deemed in default and judgment may be entered by you against us for the amount of the claim and other relief requested therein

### MISCELLANEOUS

18. Unless the context otherwise requires all terms used herein which are defined in the Uniform Commercial Code as currently enacted in the Commonwealth of Pennsylvania shall have the meanings therein stated. Unless the context otherwise requires, words in the singular number include the plural, and in the plural include the singular. The captions of the various sections are for reference purposes only and shall not be deemed in any manner to affect the meaning or interpretation of any provisions of this Agreement.

IN WITNESS WHEREOF, we have caused this Agreement to be executed and our corporate seal to be affixed by our officers thereunto duly authorized this _1st_ day of _March_ , 19 _88_.

ATTEST:

_____
Secretary (Seal)

Very truly yours,

A-1 - International Importing Enterprise, Ltd

By: _John G. Carrier_
President

Accepted at Philadelphia, Pennsylvania
on _____, 198 __.
AMERICAN TRADE CREDIT CORP

By: _____

Address:

350 Theodore Fred Avenue

Rye, New York 10580

EXHIBIT 2

Subsidiary of Butcher Industries, Inc

211 South Broad Street
Philadelphia Pennsylvania 19107

(215) 985 5146

_March 1, 1988_
Date

## Limited Guaranty

FOR VALUE RECEIVED Undersigned jointly and severally hereby guarantee to you, your successors and assigns (a · that all Purchased Accounts as defined in the Accounts Purchase Agreement dated _March 1_ 198 _8_ between you and _A-1-International Importing Enterprises, Ltd._ hereby called "Customer a _New York_ _____ corporation of _Rye_ _New York_ will be valid correct genuine and in all respects what they purport to be, will represent bona fide sales and deliveries of merchandise sold or services completed by Customer in accordance with orders therefor, and will not be forged or fictitious, that all reports statements assignments invoices, and summaries given by Customer to you under said Accounts Purchase Agreement (the "Agreement ) and any Certificate of Assignment ("Certificates") evidencing specific sales of Purchased Accounts to you will be true and accurate and that all payments received by Customer on Purchased Accounts shall be forwarded to you or to a special lock box in accordance with the Agreement and Certificate and that neither Customer nor Undersigned will initiate any motion or procedure in a Chapter 11 insolvency proceeding or otherwise to divert such remittances contrary to the provisions of the Agreement and all proceeds realized from the sale or other liquidation of Customer's returned goods in connection with the Purchased Accounts will be paid over to you in reduction of Customer's outstanding indebtedness to you in accordance with the terms and provisions of the Agreement that all financing statements invoices and Certificates covering Purchased Accounts will fully and accurately describe such Purchased Accounts, that Customer has no reason to believe that any Purchased Account is subject to offset contra accounts or counter claims of any nature whatsoever, that Customer will do nothing to impede or interfere with the collection by you of the Purchased Accounts, that Customer is presently solvent that Customer will promptly report to you all disputes with Account Debtors all rejections, returns and resales of returned goods and all credits allowed by Customer to Account Debtors, that the Purchased Accounts upon sale to you are free and clear of all liens security interests and any other encumbrances or claims of title and that no officer, employee, or agent of Customer has committed any fraud deceit or criminal act in connection with the transactions under the Agreement or any Certificate, and that the Purchased Accounts are accounts, and not evidenced by chattel paper or instruments except in your possession

This shall be a continuing Guaranty and, irrespective of the lack of any notice or consent of Undersigned their obligations hereunder shall not be impaired in any manner whatsoever by any

(a) new agreements or obligations of Customer with or to you, amendments, extensions, modifications, renewals or waivers of default as to any existing or future agreements or obligations of Customer or third parties with or to you, or extensions of credit by you to Customer.

(b) adjustments, compromises or releases of any obligations of Customer, Undersigned or other parties, or exchanges, releases or sales of any security of Customer, Undersigned or other parties,

(c) fictitiousness incorrectness, invalidity or unenforceability, for any reason, of any instrument or writing, or acts of commission or omission by Undersigned or Customer,

(d) compositions, extensions, moratoria or other relief granted to Customer pursuant to any statute presently in force or hereafter enacted, or

(e) interruptions in the business relations between you and Customer

Notice of your acceptance hereof, of default, and nonpayment by Customer or any other parties, or presentment, protest and demand, and of all other matters of which Undersigned otherwise might be entitled, is waived.

The obligations hereunder of each of Undersigned are independent and several, and shall be binding upon their respective heirs and personal representatives The failure of any person to sign this Guaranty and indemnity shall not affect the liability hereunder of any signer thereof The death or release from liability hereunder of any of Undersigned shall not relieve the others from liability hereunder This guaranty shall not be terminable by any of the Undersigned so long as any sums owing to you by Customer remain outstanding and unpaid or so long as the Agreement remains in full force and effect

The liability of the Undersigned is continuing, direct and unconditional, and may be enforced without requiring you first to resort to any other right, remedy or security No delay on your part in exercising any of your options, powers, or rights or partial o single exercise thereof, shall constitute a waiver thereof No waiver of any of your rights hereunder, and no modification o amendment of this Guaranty shall be deemed to be made by you unless the same shall be in writing, duly signed on your behalf, and each such waiver if any, shall apply only with respect to the specific instance involved, and shall in no way impair your rights or the obligations of the Undersigned to you in any other respect at any other time

Undersigned, jointly and severally, guarantees payment to you of any of your losses and damages, direct or indirect incidental or consequential, arising from the breach of any covenants. guaranties, representations or warranties under this Guaranty

Undersigned shall reimburse you on demand, for all expenses, including attorneys reasonable fees, incurred by you in the enforcement or attempted enforcement of any of your rights against Customer or any of Undersigned This Guaranty shall be construed liberally in your favor and shall be binding upon the heirs personal representatives, successors and assigns of Undersigned and the benefits thereof shall extend to and inure to the benefit of your successors and assigns This Guaranty shall be

assignable and shall be governed under the laws of the state of Pennsylvania Undersigned hereby waive their respective rights to trial by jury in the event of any litigation arising in connection with this Guaranty from Undersigned to you

Unless the context otherwise requires all terms used herein shall have the same meanings ascribed to them in the Agreement

Very truly yours

_____ _____
Witness

_____ _____
Witness

_____ _____
Witness

_____ _____
Witness

_____ _____
Witness

_____ _____
Witness

# EXHIBIT 3

### RIDER TO THE ACCOUNTS PURCHASE AGREEMENT
BETWEEN AMERICAN TRADE CREDIT CORP. AND *A-I International Importing Enterprises, Ltd.*

### GRANT OF A SECURITY INTEREST IN ACCOUNTS
### AND OTHER PROPERTY NOT PURCHASED

American Trade Credit Corp.
211 S. Broad Street
Philadelphia, PA 19107

Gentlemen:

1. INTRODUCTION

 Reference is made to that certain Accounts Purchase
Agreement from us to you and executed by us on the _____ day of
_____, 1987, hereinafter referred to as the "Agreement".

2. CONSIDERATION

 To induce you to purchase Selected Accounts per the
Agreement, you have requested that we grant to you a security
interest in certain property of ours described in paragraph 3
below, which has not been purchased by you, to secure our
obligations to you under the Agreement in the event of a Default
under the Agreement.

3. GRANT OF SECURITY INTEREST

 An additional security for any and all of our obligations to
you under the Agreement, we hereby grant to you a security
interest in and to (i) any and all of our now and hereafter
acquired accounts not sold to you, and any and all general
intangibles, contract rights, chattel paper and instruments
derived therefrom or related thereto, and all other obligations
owing to us in connection with the sale of goods by us or the
performance of services by us, constituting the basis of the
accounts not assigned to you, all books and records and other
property at any time relating to the foregoing and all products
and proceeds of any of the foregoing in any form, including but
not limited to, any claims against third parties for loss or
damage to or destruction of any and all of the foregoing, and
credit and other insurance, all hereinafter collectively called
the "Nonpurchased Accounts"; (ii) all remedies guaranteed
security and liens in respect to the Nonpurchased Accounts,

including without limitation, rights of stoppage and transit, replevin, repossession and reclamation and all other rights or remedies of an unpaid vendor, lienor, or secured party and all rights of a loss payee and policyholder under the credit insurance policy and all goods relating to or which by sale result in the Nonpurchased Accounts including, without limitation, all returned, reclaimed, or repossessed goods, and (iii) all proceeds of the foregoing in any form, including but not limited to, insurance proceeds. All of the foregoing are collectively referred to as the "Additional Collateral".

4. ENFORCEMENT OF SECURITY INTEREST

Only upon the occurrence of a Default per the Agreement, shall you have the right to repossess, foreclose or otherwise dispose of the Additional Collateral or to collect the proceeds of the Nonpurchased Accounts without our consent. Upon Default, you shall have all rights of a secured party under the terms of the Agreement and under the law for enforcing your security interest against the Additional Collateral and all the rights and remedies in and to the Additional Collateral as a secured party under the Uniform Commercial Code of the Commonwealth of Pennsylvania or other applicable law.

5. PERFECTION

We shall, at our expense, perform all acts and execute all documents requested by you at any time to evidence, perfect, maintain and enforce your security interest in the Additional Collateral. Upon your request at any time and from time to time, we shall execute and deliver one or more financing statements (in form satisfactory to you) and where permitted by law, we hereby authorize you to execute and file one or more financing statements signed only by you. We also hereby authorize you to file photocopies and other reproductions of this executed Rider to the Agreement as well as photocopies and reproductions of the executed Agreement, as financing statements and to file photocopies and reproductions of any financing statements acceptable for filing at your discretion.

6. MISCELLANEOUS

Unless the context otherwise requires, all terms used herein which are defined in the Agreement shall have the meaning therein stated.

Except as expressly set forth herein all terms and conditions of the Agreement shall remain in full force and effect.

EXECUTED this _____ day of _____ 19___

ATTEST

_____
/SECRETARY

_____

BY _____
TITLE

Agreed this _____ day of_____ 19__
at Philadelphia, Pennsylvania

American Trade Credit Corp.

BY _____

## EXHIBIT 4

Subsidiary of Butcher Industries, Inc

211 South Broad Street
Philadelphia Pennsylvania 19107

(215) 985-5146

### Certificate of Resolutions and Incumbency

I _Vincent G. Restivo_ ~~Assistant~~ Secretary

of _A1 - International Importing Enterprises, Ltd._

a _New York_ corporation (the "Corporation"), having its principal office at _350 Theodore Fremd Avenue, Rye, New York_ , hereby certify as follows:

The following is a true and correct copy of the resolutions duly adopted by the Board of Directors of the Corporation at a meeting duly called and held on _March 1_ 19 _88_ at which a quorum was present and acting throughout, that the resolutions have been recorded in the minute books of the Corporation and have not been modified, repealed or rescinded but are in full force and effect, and that the resolutions do not contravene any provision of the corporate charter or by-laws of the Corporation

RESOLVED that any one or more of the officers or agents of this corporation, be and they are hereby authorized and empowered on behalf of this corporation to enter into and execute an agreement or agreements with American Trade Credit Corp ("American") on such terms and conditions as such officer or agent deems proper, relating to the sale and assignment to American of and granting to American of all of this corporation s right, title and interest in any or all present and future accounts contract rights, general intangibles, chattel paper, instruments and other obligations receivable (collectively referred to as "Accounts") of this corporation and all goods relating to or which by sale have resulted in Accounts, including, without limitation, all returned reclaimed or repossessed goods, to sell the Accounts to American for such amounts and on such terms and conditions as such officer or agent deems proper, to assign pledge, mortgage lien hypothecate set over and otherwise transfer to American, or to grant to American a security interest in all Accounts and such other assets and property real and personal, now owned or hereafter acquired by this corporation, as may from time to time be required by American as security for all debts, liabilities and obligations of this corporation to American, now existing or hereafter arising, to make, execute and deliver to American any and all security agreements, financing statements assignments, schedules transfers notes endorsements, guaranties agreements, deeds of trust mortgages, instruments of pledge or other instruments and documents, as may from time to time be required by American in connection with any of the foregoing, to modify, extend supplement or amend any such agreements, instruments or documents and any such terms or conditions, to make remittances and payments to American by checks, drafts or otherwise, to do and perform all other acts and things deemed by such officer or agent necessary or desirable to effectuate the intent of any of the foregoing, hereby ratifying, approving and confirming all that any such officer or agent has done or may do in the premises, and that the attached Accounts Purchase Agreement is one of the agreements referred to in these resolutions and was duly executed pursuant thereto

FURTHER RESOLVED that the Secretary or any Assistant Secretary of this corporation be and hereby is authorized to certify and deliver to American, under corporate seal, copies of this and the foregoing resolutions.

I do further certify that the following named persons are duly elected and qualified officers of the Corporation, presently serving as such, and that following each name is the true signature of each such officer

President _John G. Cassidy_ _Signature_

Vice President _Kevin P. Cassidy_ _Signature_

Secretary _Vincent G. Restivo_ _Signature_

Treasurer _Kevin P. Cassidy_ _Signature_

Witness my hand and seal of the Corporation this _1st_ day of _March_ 19 _88_.

(Corporate Seal)

_(Assistant Secretary)_